UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | | |
|---|---|---|
| DONNA MARSHALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL NO.   1:18CV398 |
| | ) | |
| STATE OF INDIANA/INDIANA | ) | |
| DEPARTMENT OF TRANSPORTATION, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION AND ORDER</u>

This matter is before the court on a motion for summary judgment filed by the defendant, State of Indiana/Indiana Department of Transportation ("INDOT"), on December 20, 2019. Plaintiff, Donna Marshall ("Marshall"), responded to the motion on April 30, 2020, to which INDOT replied on May 14, 2020.

For the following reasons, the motion will be granted.

<u>Summary Judgment Standard</u>

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Not every dispute between the parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the

non-moving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010).

Under Rule 56, the movant has the initial burden of establishing that a trial is not necessary. *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 627 (7th Cir. 2014). "That burden may be discharged by showing . . . that there is an absence of evidence to support the nonmoving party's case." *Id*. (citation and internal quotation marks omitted). The nonmovant "must go beyond the pleadings (*e.g.*, produce affidavits, depositions, answers to interrogatories, or admissions on file) to demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in [its] favor." *Id*. (citation and internal quotation marks omitted). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). "[S]peculation and conjecture" also cannot defeat a motion for summary judgment. *Cooney v. Casady*, 735 F.3d 514, 519 (7th Cir. 2013). In addition, not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). A party opposing a properly supported summary judgment motion may not rely merely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party does not establish the existence of an essential element on which that party bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006). Summary judgment "is the put up or shut up moment in a lawsuit ...." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

2

<u>Discussion</u>

In February 2016, Marshall was hired by INDOT as an Administrate Assistant 6 ("AA6") to the Director of Highway Maintenance, Charles "Chuck" Neuenschwander. (Def. Ex. A – Transcript of Plaintiff Donna Marshall Dep. 10:3-9.) Marshall's job duties included keeping track of the mileage logs for the vehicles of the entire district. (Marshall Dep. 10-11:20-6.) Marshall was also the key coordinator, keeping track of the keys for the district. (Marshall Dep. 10-11:20-6.) One of the job requirements of the AA6 position was "excellent interpersonal skills." ( Def. Ex. F - Administrative Assistant 6 Job Description.) Marshall reported directly to Chuck Neuenschwander (Marshall Dep. p. 10-12.), who in turn reported to Todd Johnson, the Deputy District Commissioner. (*Id*. p. 12.)

After her termination, Marshall filed the present Title VII action alleging sexual discrimination, sexual harassment, and retaliatory discharge.

Marshall alleges that she was sexually harassed by Tom Dull, a co-worker. Tom Dull was the maintenance manager. (Marshall Dep. 17:2-4.) In May 2016, Marshall alleges that Tom Dull started harassing her. (Marshall Dep. 16:16-17.) Dull would "leer" at Marshall at weekly meetings. (Marshall Dep. 17:8-14.) Intermittently, in staff meetings, Dull would purposely put his leg against Marshall's leg. (Marshall Dep. 16-17:24-9.)

One day, Marshall was checking in Neuenschwander's office to see if Neuenschwander was in the office. (Marshall Dep. 19:17-9.) Right outside of Neuenschwander's office, Dull came up behind Marshall and put his arm around Marshall's back and dragged it across her back. (Marshall Dep. 18-19:19-13.) Dull said "Oh, Chuck's not in there." (Marshall Dep. 19:14-15.) No one else saw this occur. (Marshall Dep. 19:5-6.) Marshall did not tell anyone that day and did

3

not tell anyone in the office until she later reported it to human resources. (Marshall Dep. 19:16-22.)

On another day, there was a supervisor's meeting in a conference room. (Marshall Dep. 20:2-7.) There were at least more than twenty people in the conference room. (Marshall Dep. 20:9-23.) There were envelopes on the table that had information from the communications department. (Marshall Dep. 21:14-20.) Marshall was standing and making sure that anyone who still had an envelope on the table would grab the envelope. (Marshall Dep. 21:14-20.) As Dull walked into the conference room, he rubbed right up against Marshall's breasts with the side of his body. (Marshall Dep. 21-22:21-3.) Dull did not say anything. (Marshall Dep. 22:1.) Marshall did not tell anyone at INDOT what happened until she later reported it to HR. (Marshall Dep. 22:6-9.)

Julie Applegate was the HR Manager in Marshall's district. (Marshall Dep. 23-24:22-2.) On November 13, 2017, Marshall went into Applegate's office and discussed the allegations with her. (Marshall Dep. 23-24:22-6; Marshall Dep. 64-65:22-14.) Marshall told Applegate what was explained above about the issues with Dull. (Marshall Dep. 24:7-10.) Applegate assured Marshall that she would take care of it. (Marshall Dep. 24:12-18.) Applegate told Marshall that she would not be retaliated against for reporting, and Applegate told Marshall that Applegate needed to know if retaliation occurred. (Marshall Dep. 24:12-18.) Applegate told Marshall that someone needed to speak with Dull and gave Marshall the option of talking to Dull herself, talking to Dull with Applegate, or talking to Dull with Neuenschwander. (Marshall Dep. 69:17-19, 72:2-7.) Marshall wanted to talk to Dull herself so she could clear up the matter herself. (Marshall Dep. 72:11-16.)

After talking to Applegate, Marshall went and spoke to Dull. (Marshall Dep. 67-69:22-19). Marshall told Dull that he was in her personal space, she was very uncomfortable about it, and that it needed to stop. (Marshall Dep. 68:4-7.) Dull said "I'm sorry. I didn't realize I was doing that." (Marshall Dep. 68:8-10.) Dull told Marshall that he was unaware that he was putting his arm around Marshall or brushing up against Marshall. (Marshall Dep. 69:5-9.) After making the report to Applegate and talking to Dull, the touching stopped, but the "leering" did not. (Marshall Dep. 25:17-25; 68-69:23-4.) Marshall reported the continued "leering" to Applegate. (Marshall Dep. 26-27:24-7.) The "leering" stopped on December 18, 2017. (Marshall Dep. 117:8-23.)

Sararita Vanderbilt was Applegate's boss. (Marshall Dep. 41:9-10.) On December 21, 2017, Vanderbilt informed Marshall that the investigation did not lead to a finding that substantiated the harassment allegation. (Marshall Dep. 81:8-17.) However, Marshall does not believe that the investigation took place properly. (Marshall Dep. 81:8-17.) Marshall was told that the investigation was closed, but she wanted to know what took place during the investigation, how Applegate investigated, and how Marshall could feel safe that things were handled in a proper manner. (Marshall Dep. 27:4-7, 79:12-23.) It is Marshall's understanding that a report was supposed to be submitted to central office and that Marshall was supposed to be kept informed as the inquiry was being done, but neither was done. (Marshall Dep. 27: 8-13.)

Marshall was required to get a yearly update from the subdistricts. (Marshall Dep. 28:8-12.) Marshall reminded the Fort Wayne subdistrict manager, Dennis Warnick, that the information still needed to be handed in. (Marshall Dep. 29:18-20.) Warnick copied Marshall on an email requesting the information from his administrative assistant, Briana Murawski.

(Marshall Dep. 29-30:18-1.) Marshall requested the information again a few weeks later, but Murawski did not have it done yet. (Marshall Dep. 30:3-12.)

On Friday, February 5, 2018, Marshall decided to talk to Warnick to see if Marshall could do the Fort Wayne subdistrict report because Murawski was new. (Marshall Dep. 30:14-17; Exhibit C - Employee Corrective Action Form: Written Reprimand dated 2-8-2018). Marshall walked over to the subdistrict, and Warnick was talking to Murawski. (Marshall Dep. 20:18-20.) Warnick started walking away and Marshall asked if Warnick had a few moments to speak with her. (Marshall Dep. 30:22-4.) Warnick jokingly said "No. I got to be somewhere." (Marshall Dep. 30-31:25-1.) As Warnick was saying that, Murawski said "she is looking for the key logs, and I don't have them. (Marshall Dep. 31:2-4.) Marshall asked Warnick if she could help out with it, and Murawski said that Marshall had been looking for the information for a long time and that its not that important. (Marshall Dep. 31:5-8.) Murawski asked why Marshall was blowing up at her, and Marshall said to Warnick "does it sound like I'm blowing up at [Murawski]?" (Marshall Dep. 31:7-11.) Warnick said "you both sound stressed." (Marshall Dep. 31:10-11.) Warnick and Marshall then discussed Marshall taking care of the bridge department, and Murawski would do the rest. (Marshall Dep. 31:12-24.)

On the next Monday, February 8, 2018, Marshall went into Neuenschwander's office and told him what happened, telling Neuenschwander that Murawski and Marshall "had some words." (Marshall Dep. 33:1-13; Ex. B –Neuenschwander Decl. ¶ 3.) Neuenschwander said "I heard something about that. Everyone has bad days." (Marshall Dep. 33:1-13.) Mr. Warnick also brought the incident to Neuenschwander's attention. (Ex. B – Declaration of Charles Neuenschwander ¶ 3.) Neuenschwander believed that Marshall could have handled herself better

6

in the interaction and that she was not professional. (Ex. B –Neuenschwander Decl. ¶ 3.)

Later that day, Neuenschswander called Marshall into his office and let Marshall know that she was receiving a written reprimanded for the incident. (Marshall Dep. 33:13-18; Ex. B –Neuenschwander Decl. ¶ 3; Ex. C – Written Reprimand.) Marshall told Neuenschwander that she did not believe that the incident rose to the level of a reprimand, but Murawski and Marshall did have words, so Marshall accepted it. (Marshall Dep. 34:13-16.)

On Friday, February 16, 2018, Marshall had an interaction with Renaye Newsome. (Ex. D - Employee Corrective Action Form for the 5-day suspension.) Newsome had previously held the position Marshall currently held. (Marshall Dep. 35:14.) Newsome emailed Marshall to inform Marshall that Newsome had turned in the keys for the some cabinets to the accounting department. (Marshall Dep. 35:14-18.) Marshall passed Newsome in the hallway, and Newsom said something to the effect that she was not going to sign out the keys. (Marshall Dep. 36:9-13.) These comments were made right outside of Newsome and Applegate's offices. (Marshall Dep. 38:14-20.) Marshall said "well that's, you know, policy." (Marshall Dep. 36:9-13.) Marshall then went to the mail room, which took a minute or so, and then went directly to Applegate's office and informed Applegate that Newsome was not pleased with the situation. (Marshall Dep. 36:14-17.) After speaking to Applegate, Marshall emailed Newsom to explain the key policy and inform Newsome that if she had any further questions, she could speak with Applegate. (Marshall Dep. 36:22-25.) On the following Monday, February 19, 2019, Marshall then went to Neuenschwander and told him her version of the incident with Newsome. (Ex. B –Neuenschwander Decl. ¶ 5.)

Later on Monday, February 19, 2019, Marshall walked by the utility room and the door

was open and there was a seasonal employee in the key cabinet. (Marshall Dep. 37:1-7; Ex. D -

5-day suspension.) Marshall had not been told that someone would be in the cabinet and seasonal

employees are not allowed to have keys per policy. (Marshall Dep. 37:7-10.) Erin Hunter is the

other administrative assistant for Marshall's area, and she reports to Tom Dull. (Marshall Dep.

37:10-13.) Marshall asked Hunter if she knew why the seasonal employee was in the key cabinet.

(Marshall Dep. 37:10-17.) Hunter asked Marshall why she was being so defensive, and Marshall

said "Well, I'm not being defensive. I am responsible for the keys." (Marshall Dep. 37:17-21.)

Hunter explained that the seasonal employee had been asked to alphabetize the keys. (Marshall

Dep. 37:20-22.)

Later that day on February 19, 2018, Erin Hunter came to the manager's meeting to talk

to with Neuenschwander. (Ex. B –Neuenschwander Decl. ¶ 5.) Because Neuenschwander was in

the meeting, Hunter went and spoke to Applegate in Human Resources about the interaction

between Hunter and Marshall earlier that day. (Ex. B –Neuenschwander Decl. ¶ 5.) Applegate

then informed Neuenschwander about the incident between Hunter and Marshall. (Ex. B

–Neuenschwander Decl. ¶ 5.) Hunter provided a written statement of her interaction. (Ex. B

–Neuenschwander Decl. ¶ 5.)

After the staff meeting later that day, Neuenschwander called Marshall into his office and

informed Marshall that she was being rude and unprofessional again. (Marshall Dep.

37-38:23-2.) Marshall learned that Hunter had complained that Marshall was unprofessional to

her. (Marshall Dep. 40:1-5.) Marshall was informed that she was being suspended for five days

without pay. (Marshall Dep. 38:11-13.) Marshall told Neuenschwander that what he was saying

did not happen, that she was not rude and unprofessional. (Marshall Dep. 39:22-25.)

8

Neuenschwander said that he did not believe Marshall. (Marshall Dep. 40:14-17.)

Neuenschwander made the decision to suspend Marshall after talking to Marshall and getting her side of the story about the February 16 and February 19 incidents, and after talking to Newsome and Applegate and reviewing the written statements of Newsome, Applegate, and Ms. Hunter. (Ex. B –Neuenschwander Decl. ¶ 7.)

Marshall thought her suspension "had to do with my sexual harassment. While it was not directly related, I felt that I was being – things were being made up about me." (Marshall Dep. 41:13-19.) Marshall believes that she was retaliated against because both of the instances involving Hunter and Newsome were made up, she was acting in a very professional manner, and then she was suspended for five days. (Marshall Dep. 43:4-18.)

On February 26, 2018, after Marshall's suspension, Marshall's attorney, Chris Myers, wrote a letter to Todd Johnson, the Deputy District Commissioner. (Marshall Dep. 43-44:20-17; Ex. G – Attorney Myer's Letter to INDOT.) On April 17, 2018, Marshall filed her EEOC complaint. (Marshall Dep. 44-45:25-3; Ex. H – EEOC Complaint.)

On Marshall's first day back from her suspension, Marshall was called into a meeting with Neuenschwander, Applegate, and Vanderbilt. (Marshall Dep. 45:7-14.) Vanderbilt and Marshall agreed that Marshall wanted to be successful at INDOT. (Marshall Dep. 45:15-24.)

In May 2018, INDOT created a new Logistics Department for the Fort Wayne District. (Ex. B –Neuenschwander Decl. ¶ 8, Marshall Dep. 49:6-11.) Marshall wanted to apply for the administrative assistant job in the Logistics Department "that was held and is held in the other districts." (Marshall Dep. 49:12-16.) Marshall inquired with Applegate and Neuenschwander, and they informed Marshall that the position was not going to be an administrative assistant job,

but instead a "damage-wise" position. (Marshall Dep. 49:17-21.) Marshall asked Vanderbilt what the job was going to be, and Vanderbilt said that she did not understand why Applegate and Neuenschwander told Marshall different, but Vanderbilt would check into it. (Marshall Dep. 50:9-16.) Applegate got back with Marshall and told Marshall that there was not going to be an Administrative Assistant 6 position in the Fort Wayne Logistics Department. (Marshall Dep. 50:17-21.) Neuenschwander announced at a supervisor's meeting that there would not be an administrative assistant position in the logistics department other than the damage-wise coordinator. (Marshall Dep. 50-51:21-4.)

In early May 2018, Neuenschwander moved Hunter, who was an AA6 and acted as the "damage-wise" coordinator, to the Logistics Department. (Ex. B –Neuenschwander Decl. ¶ 8.) Neuenschwander did not create a new AA6 position in the Logistics Department, he just moved Hunter to the Logistics Department. (Ex. B –Neuenschwander Decl. ¶ 8.) The Logistics Department AA6 position was never posted and never open for anyone to apply. (Ex. B –Neuenschwander Decl. ¶ 8.) Hunter had a background in "damage-wise", as she was the damage-wise coordinator. (Ex. B –Neuenschwander Decl. ¶ 8.) Damage-wise is the process by which the State recovers money for the damage to State property by filing claims. (Ex. B –Neuenschwander Decl. ¶ 8.) Hunter was the best damage-wise coordinators at INDOT and she frequently worked and trained others that work with damage-wise. (Ex. B –Neuenschwander Decl. ¶ 8.) Damage-wise was about recovering money and working with money, and the new Logistics Department also worked with money. (Ex. B –Neuenschwander Decl. ¶ 8.) Applegate told Marshall that the job was not posted because "all along it was going to be an admin job, and Erin was going to have it." (Marshall Dep. 51:9-13.)

10

On Thursday, July 19, 2018, Marshall went to Applegate's office. (Marshall Dep. 56:9-21; Ex. B –Neuenschwander Decl. ¶ 9.) Marshall claims that the following conversation occurred:

> Getting back now into Julie's office, I sat down and I said, "Julie, you know, both you and Chuck made it very clear to me that this was not going to be an administrative assistant position. And it was going to be a damage-wise position." And she said, "No, Donna. You misunderstood."
>
> And I then said to her, "Well, Julie, remember the meeting we had, and you were crying and wanted to be friends again. And you said this would be handled aboveboard."· I said, "Things haven't changed."· And I got up to walk out. I opened the door and turned back to Julie and she said, "That was very rude."· And I said, "That was the truth."

(Marshall Dep. 56:9-21.)

Applegate came to Neuenschwander's office and told Neuenschwander that Marshall had called her a liar and said that Applegate did not know how to do her job. (Marshall Dep. 58:1-2; Ex. B –Neuenschwander Decl. ¶ 9.) Neuenschwander then called Marshall into his office. (Ex. B –Neuenschwander Decl. ¶ 10.) Marshall told Neuenschwander her side of the story. (Ex. B –Neuenschwander Decl. ¶ 10.) After weighing the statements of both Applegate and Marshall, Neuenschwander believed Applegate because Marshall had a history of unprofessional behavior, and Applegate had always been honest with Neuenschwander. (Ex. B –Neuenschwander Decl. ¶ 11.) However, even when Neuenschwander heard Marshall's side of the story, Neuenschwander thought that Marshall's behavior, as she described it, was still unprofessional. (Ex. B –Neuenschwander Decl. ¶ 10.)

After Neuenschwander spoke to Marshall, Neuenschwander and Applegate went to talk to District Deputy Commissioner Todd Johnson. (Ex. B –Neuenschwander Decl. ¶ 12.) They had

a discussion in which they agreed that it was time to terminate Marshall because of her unprofessional behavior. (Ex. B –Neuenschwander Decl. ¶ 12.) However, since Marshall was Neuenschwander's AA6, the decision was ultimately up to Neuenschwander. (Ex. B –Neuenschwander Decl. ¶ 12.)

On July 24, 2018, Marshall then got called into a meeting with Neuenschwander and District Deputy Commissioner Johnson. (Marshall Dep. 58:1-2; Ex. D – Termination Letter dated April 14, 2016.) District Deputy Commissioner Johnson and Neuenschwander informed Marshall that she was being terminated due to her unprofessional behavior and poor judgment. (Ex. B –Neuenschwander Decl. ¶ 13; Ex. D – Termination Letter.) They told Marshall that she was being fired because she called Applegate a liar, because of the situation with Hunter and Newsome, and the incident with Murawski. (Marshall Dep. 56:23-4.)

In support of summary judgment, INDOT first argues that it did not discriminate against Marshall on the basis of her sex.  In any employment-discrimination case, the Court must look to see whether the evidence would permit a reasonable fact-finder to conclude that the plaintiff was subjected to an adverse employment action based on a statutorily prohibited factor. *McCurry v. Kenco Logistics Services, LLC*, 942 F.3d 783, 788 (7th Cir. 2019). To successfully set forth a prima facie case of sex discrimination, Marshall must show that "(1) [s]he is a member of a protected class; (2) [s]he was performing well enough to meet h[er] employer's legitimate performance expectations; (3) [s]he suffered an adverse employment action; and (4) similarly situated employees not in h[er] protected class were treated more favorably." *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 599 (7th Cir. 2010).

INDOT argues that Marshall is unable to set forth a prima facie case because she was not

meeting her employer's legitimate work expectations and because she can identify no similarly situated employee not in her protected class that was treated more favorably.

INDOT claims that Marshall had four separate instances in which she was unprofessional in the work place, and as a result she received progressive discipline First, Marshall received a written reprimand for an unprofessional interaction with Briana Murawski. (Ex. C - Written Reprimand; Marshall Dep. 33:1-13.) Next, Marshall received a 5-day suspension for two separate unprofessional interactions: one with Renaye Newsome and one with Erin Hunter. (Ex. D - 5-day suspension; Marshall Dep. 37-40:23-17.) Lastly, Marshall was terminated after she had an unprofessional interaction with Julie Applegate. (Ex. E - Termination Letter; Marshall Dep. 56:23-4.)

Unprofessional behavior such as Marshall's is sufficient to show that she was not meeting the legitimate expectations of INDOT and Neuenschwander. The Court must not "merely consider whether a plaintiff's actual job performance was satisfactory"; rather, the Court must also contemplate "factors such as insubordination and workplace camaraderie." *Abrego v. Wilkie*, 907 F.3d 1004, 1013 (7th Cir. 2018) (quoting *Zayas v. Rockford Mem'l Hosp.*, 740 F.3d 1154, 1158 (7th Cir. 2014)). In *Abrego*, the Seventh Circuit found that there was sufficient evidence that an employee was not performing up to the expectations of his job despite receiving "fully successful" performance reviews. *Abrego*, 907 F.3d at 1013. Even with the performance reviews, the employee argued with a patient; said he would refuse to assist a patient in the future; yelled and intimidated coworkers; and behaved disrespectfully towards his supervisor. *Abrego*, 907 F.3d at 1013.

INDOT argues that Marshall's unprofessional interactions with her co-workers, despite

13

prior warnings and discipline, are examples of insubordination and an attack on workplace camaraderie. Marshall disputes that she acted unprofessional in the interactions that led to her discipline. INDOT contends, however, even given Marshall's version of the altercations, there is still sufficient evidence that two of her interactions were unprofessional. As for her first interaction with Murawski, Marshall admits that she and Murawski "had some words" and as a result she accepted the written reprimand. (Marshall Dep. 33:1-13, 34:13-16.) As for Marshall's final interaction with Applegate, Marshall told Neuenschwander her version of the story. Even when Neuenschwander heard Marshall's side of the story, Neuenschwander still thought that Marshall's behavior, as she described it, was unprofessional. (Ex. B –Neuenschwander Decl. ¶ 10.)

Nevertheless, Marshall claims that the discipline was pretextual. She claims that the interactions with Murawski did not rise to the level of being disciplinary, and that Newsome, Hunter, and Applegate are lying about their interactions with Marshall. When assessing a plaintiff's claim that an employer's explanation is pretextual, courts "ask only whether the employer's explanation was "'honestly believed.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008) (citing *Culver v. Gorman*, 416 F.3d 540, 540 (7th Cir. 2008)). "In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc*., 687 F.3d 297, 311 (7th Cir. 2012) (internal quotation marks and citation omitted). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Argyropoulos*, 539 F.3d at 736.

14

Further, under Title VII, Marshall must provide "evidence that the decisionmaker has acted for a prohibited reason. A decisionmaker is the person 'responsible for the contested decision.'" *Rogers v. City of Chicago*, 320 F.3d 748, 754 (7th Cir.2003) (quoting *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 396 (7th Cir. 1997)). Here, Marshall was the administrative assistant to Charles Neuenschwander, and the decision was left to him to discipline Marshall. (Ex. B –Neuenschwander Decl. ¶ 12.)

Marshall does not argue that Neuenschwander made up these interactions to discipline her. Marshall herself testified that the interactions occurred. Instead, Marshall is arguing that Murawski, Hunter, Newsome, and Applegate are lying about their interactions with her. INDOT contends, however, that even given Marshall's version of the interactions, the interactions with Murawski and Applegate were unprofessional.

Since Marshall admits that the interactions occurred, to show pretext it is up to Marshall to show that Neuenschwander "did not genuinely believe" Murawski, Hunter, Newsome, and Applegate's version of the story. *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003). "It is not enough for her to show that the investigators might have made a mistake in their conclusion." *Id.* Even erroneous decisionmaking by an employer is not sufficient to establish pretext. *Pitasi v. Gartner Group*, 184 F.3d 709, 718 (7th Cir. 1999). "Therefore it is not sufficient for the employee to show that [her] employer fired [her] for incorrect or poorly considered reasons. [She] must establish that the employer did not honestly believe the reasons it gave for terminating him." *Id.* INDOT maintains that Neuenschwander honestly believed the stories of Murawski, Newsome, Hunter, and Applegate over the story of Marshall (and/or believed Marshall's story of her interaction with Murawski and Applegate). (Ex. B

15

–Neuenschwander Decl. ¶¶ 3-7, 9-13.) INDOT also explains that Neuenschwander had good reason to not believe Marshall, as she had lied on her resume when she did not disclose that she had worked for and been fired by PNC. (Marshall Dep. 13:3-14, 15:2-9.)

In response to the motion for summary judgment on the sex discrimination claim, Marshall argues that there is a factual dispute as to Marshall's performance and that there was suspicious timing. Marshall "attacks the underlying facts of the allegations of unprofessional conduct." (ECF 30, p. 4.) Marshall "hotly contests the Defendant's characterizations of her interactions with Renaye Newsome, Erin Hunter and Julie Applegate." (ECF 30, p. 4.) Yet, for each of the confrontations, INDOT's memorandum relied on Marshall's description of the incident as memorialized in her deposition.

Thus, in effect, Marshall is arguing that INDOT's reason for terminating her was pretextual – *i.e.*, the underlying confrontations were just excuses for INDOT to terminate Marshall. When determining if INDOT's decision was pretextual, the underlying confrontations are not what must be examined. Instead, when assessing a plaintiff's claim than an employer's explanation is pretextual, courts "ask only whether the employer's explanation was "'honestly believed.'" *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008). "In determining whether an employer's stated reason [for discharge] is pretextual, the question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *Harper v. C.R. England, Inc*., 687 F.3d 297, 311 (7th Cir.2012) (internal quotation marks and citation omitted). "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action." *Argyropoulos*, 539 F.3d at 736.

16

As INDOT points out, Marshall does not – and cannot – dispute what Newsome, Hunter, or Applegate told Neuenschwander. And she cannot dispute the investigation that Neuenschwander undertook, or his thought process in arriving at his decision. Rather, to show pretext it is up to Marshall to show that Neuenschwander "did not genuinely believe" Murawski, Hunter, Newsome, and Applegate's version of the story. *Adams v. Wal-Mart Stores, Inc*., 324 F.3d 935, 940 (7th Cir. 2003). What Marshall is actually saying is that INDOT came to the wrong conclusion. But this does not mean that there is triable issue of fact. Even erroneous decision-making by an employer is not sufficient to establish pretext. *Pitasi v. Gartner Group*, 184 F.3d 709, 718 (7th Cir. 1999).

Marshall also points to her previous work performance. (ECF 30, p. 4.) However, although Marshall "may have been performing adequately at the time of her positive evaluation, the critical inquiry is her 'performance at the time of [her termination].'" *Burks v. Wisconsin Dept. of Transportation*, 464 F.3d 744, 753 (7th Cir. 2006) (quoting *Moser v. Indiana Dep't of Corr.*, 406 F.3d 895, 901 (7th Cir.2005)) (emphasis in original). "Therefore, although prior evaluations can be relevant in some circumstances, they 'cannot, by themselves, demonstrate the adequacy of performance at the crucial time when the employment action is taken.'" *Burks*, 464 F.3d at 753(quoting *Fortier v. Ameritech Mobile Communications, Inc*., 161 F.3d 1106, 1113 (7th Cir.1998)).

Marshall next argues that the timing of her infractions is suspicious and that a jury could decide that the timing of Marshall's discipline was evidence of pretext. (ECF p. 5.) But, as a matter of law, the timing alone is insufficient to support Marshall's claim.  Marshall reported the allegations to Applegate on November 13, 2017. (Marshall Dep. 23-24:22-6; Marshall Dep.

64-65:22-14.) But Marshall's written reprimand, her first disciplinary action, did not occur until February 8, 2018. (Neuenschwander Decl. ¶ 3; Def. Ex. C – Written Reprimand.) A two month gap between the protected activity is too great a temporal gap to permit a reasonable inference of causation based on timing alone. *See, e.g., Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (concluding that a five-week gap between the protected activity and the adverse employment action "militate[s] against allowing an inference of causation based on suspicious timing"). "For an employer's actions to be on the close heels of an employee's conduct, thus allowing an inference of causation based on timing alone, [the Seventh Circuit] 'typically allow[s] no more than a few days to elapse.'" *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (quoting *Kidwell*, 679 F.3d at 966) (the protected activity and adverse action must be "very close" in time); *see also Lord*, 839 F.3d at 564 (plaintiff was fired two days after he complained about sexual harassment). \After Marshall's 5-day suspension, Marshall filed her EEOC claim on April 17, 2018. (Def. Ex. H – EEOC Complaint.) But Marshall was not terminated until more than three months later on July 24, 2018. (Def. Ex. E – Termination Letter.) If a two month gap is too great a temporal gap to permit a reasonable inference of causation based on timing alone, *Kidwell*, 679 F.3d at 967, then a gap of greater than three months similarly does not permit a reasonable inference of causation.

Marshall reported her allegations on November 13, 2017, and was not terminated until July 24, 2018, more than eight months after her allegation. And there were two intervening disciplines: a written reprimand and a suspension. INDOT argues that If Neuenschwander wanted to terminate Marshall for her sexual harassment and only used the confrontations as pretext, Neuenschwander could have terminated Marshall after the first incident with Murawski. INDOT

18

contends that it makes no sense for Neuenschwander to take over eight months and use three progressive disciplines if he intended to terminate Marshall for reporting allegations of sexual harassment. The timing is simply not evidence of pretext. This Court agrees with INDOT that Marshall has failed to present material contested facts regarding her sex discrimination claim, and summary judgment will be entered in favor of INDOT on this claim.

Next, INDOT argues that Even if Marshall were meeting INDOT's legitimate work expectations, Marshall cannot point to "similarly situated employees not in h[er] protected class were treated more favorably." *Naik*, 627 F.3d at 599. Marshall claims that she was treated less favorably because she was disciplined for her interactions with Briana Murawski, Renaye Newsome, Erin Hunter, and Julie Applegate, and Neuenschwander believed those women's version of the interactions instead of Marshall's version. The flaw in Marshall's argument is that all four of these employees are also women. Thus, they are not "similarly situated employees not in h[er] protected class were treated more favorably." *Naik*, 627 F.3d at 599 (emphasis added).

In response to this argument, Marshall argues that INDOT's argument fails because "Murawski, Newsome, Hunter and Applegate were not sexually harassed." (ECF 30 p. 6.) But INDOT did not point out the lack of similarly situated comparators for the purpose of Marshall's sexual harassment claim, but, rather, for her sexual discrimination claim. To successfully set forth a *prima facie* case of sex discrimination, Marshall must show that "similarly situated employees not in h[er] protected class were treated more favorably." *Naik v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 627 F.3d 596, 599 (7th Cir. 2010). Since Marshall cannot point to any similarly situated comparators, she cannot establish a prima facie case of sex discrimination. Therefore, INDOT is entitled to summary judgment on Marshall's sex

19

discrimination claim for this additional reason.

Next, INDOT argues that Marshall cannot meet the burden of proving sexual harassment under Title VII and, in any event, INDOT took appropriate remedial actions.  In order to support a Title VII claim of sexual harassment, the plaintiff must provide evidence that: "she was (1) subjected to unwelcome sexual conduct, advances, or requests; (2) because of her sex; (3) that were severe or pervasive enough to create a hostile work environment; and (4) that there is a basis for employer liability." *Erickson v. Wisconsin Dep't of Corr.*, 469 F.3d 600, 604 (7th Cir. 2006).

For harassment to be actionable under Title VII, the conduct must be "so severe or pervasive as to alter the conditions of [ ] employment and create an abusive working environment." *EEOC v. Mgmt. Hospitality of Racine, Inc*., 666 F.3d 422, 432 (7th Cir. 2012) (internal citation and quotation marks omitted). Marshall must demonstrate that the alleged harasser's behavior was both objectively and subjectively offensive. *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 788 (7th Cir. 2007). "Courts look to several factors to determine whether alleged harassment was objectively offensive, including the frequency of the conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the alleged victim's work performance." *Id*.

Marshall claims that Tom Dull would "leer" at Marshall at weekly meetings. (Marshall Dep. 17:8-14.) Intermittently, in staff meetings, Dull would purposely put his leg against Marshall's leg. (Marshall Dep. 16-17:24-9.) Marshall also claims while standing outside of Neuenschwander's office, Dull came up behind Marshall and put his arm around Marshall's back and dragged it across her back, saying "Oh, [Neuenschwander's] not in there." (Marshall Dep.

18-19:19-15.) Lastly, Marshall claims that while she was standing in a conference room with twenty people, Dull walked into the conference room, he rubbed right up against Marshall's breasts with the side of his body, but did not say anything. (Marshall Dep. 21-22:21-3.)

INDOT argues that these accusations are not objectively offensive, as "isolated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002). In *Hilt-Dyson*, the Seventh Circuit found that two back rubbing incidents were not objectively hostile or abusive. The Seventh Circuit noted that on "each occasion, the back rubbing incident was brief and involved no threats, intimidation or humiliation." *Id.* The Seventh Circuit also noted that upon learning that the conduct troubled the plaintiff, the alleged harasser told the plaintiff he would never touch her again, and that he never touched nor attempted to touch the plaintiff again. *Id*. at 464.

INDOT argues that, as in *Hilt-Dyson*, the alleged touching was "brief and involved no threats, intimidation, or humiliation." And just as in Hilt-Dyson, as soon as Marshall told Dull to stop, the touching stopped. (Marshall Dep. 68:4-7, 68-69:23-4.) Dull said "I'm sorry. I didn't realize I was doing that." (Marshall Dep. 68:8-10.) Dull told Marshall that he was unaware that he was putting his arm around Marshall or brushing up against Marshall. (Marshall Dep. 69:5-9.) INDOT concludes that, for the same reasons as the Seventh Circuit found in *Hilt-Dyson*, Dull's alleged actions were not objectively offensive. *See also Scott v. Sears, Roebuck & Co.*, 798 F.2d 210, 211–214 (7th Cir. 1986) (not sufficient for a sexual harassment claim where plaintiff being subjected to propositions, lewd comments and a slap on the buttocks when these were relatively isolated instances); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (not sufficient for sexual harassment claim where alleged harasser asked for dates, called

21

plaintiff a "dumb blond," put his hand on plaintiff's shoulder several times, and placed "I love

you" signs in plaintiff's work area and attempted to kiss plaintiff in a bar).

Marshall alleges that although the physical contact stopped immediately, the "leering"

continued until December 18, 2018. (Marshall Dep. 117:8-23.) However, as INDOT points out,

the Seventh Circuit has held that staring or looking, even when combined with touching, is not

objectively hostile. *See Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998)

(staring and attempting to make eye contact, along with complaints about ambiguous comments

and four incidents of a co-worker touching the plaintiff's arm, fingers, or buttocks, was not

sufficient to find sexual harassment); *Savino v. C.P. Hall Co.*, 199 F.3d 925, 933 (7th Cir. 1999)

(staring at plaintiff and failing to give her gift certificate was not sufficient to create a hostile

work environment); *Lindblom v. Challenger Day Program, Ltd.*, 37 F. Supp.2d 1109, 114 (N.D.

Ill. 1999) (male coworker's alleged conduct of staring at female teacher while she was teaching,

touching her knee five times and her shoulder ten times, standing too close to her, and

questioning her about her weekends was insufficiently severe and pervasive to support Title VII

hostile work environment sexual harassment claim against school).

In response to INDOT"S request for Summary Judgment on her sexual harassment claim,,

Marshall "begs to differ" and claims that Dull's conduct was "of course" offensively objective

and pervasive and severe. (ECF 30 p. 6.) However, in support, Marshall simply recites her

allegations. Marshall does not address the plethora of case law provided by INDOT. Nor does

Marshall direct the court to any case supporting her position. That is likely because the Seventh

Circuit case law is clear: conduct of the level described by Marshall is not objectively offensive

and, therefore, INDOT is entitled to summary judgment on Marshall's sexual harassment claim.

22

In any event, INDOT further argues that even if this Court found that Dull's actions were objectively hostile, INDOT is still entitled to summary judgment because INDOT took appropriate remedial actions. When an employee is harassed by a co-worker, the employer may be held responsible only if "the employer knew or should have known about an employee's acts of harassment and fails to take appropriate remedial action." *Brooms v. Regal Tube Co.*, 881 F.2d 412, 421 (7th Cir.1989). "If an employer takes reasonable steps to discover and rectify the harassment of its employees, however, it has discharged its legal duty." *McKenzie v. Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996). "An employer's response to alleged instances of employee harassment must be reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Brooms*, 881 F.2d at 421. The focus is not "solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed." Id. "The reasonableness of an employer's response depends, in part, on the gravity of the harassment alleged." *McKenzie*, 92 F.3d at 480.

In the present case, as INDOT argues, as soon as INDOT was aware of the touching allegations, the situation was remedied. Marshall talked to Applegate in Human Resources on November 13, 2017, and then talked to Dull. (Marshall Dep. 23-24:22-6, 67-69:22-19.) As soon as Marshall told Dull that he made her uncomfortable, the touching stopped. (Marshall Dep. 68:4-7, 68-69:23-4.) Dull was unaware of the touching, and apologized. (Marshall Dep. 68:8-10, 69:5-9.) Marshall herself admits that after she reported the alleged touching to Applegate in HR, the touching stopped. (Marshall Dep. 25:17-25.) The action was not likely to prevent it from reoccurring, it did prevent it from reoccurring.

23

To the extent that the "leering" could also be considered sexual harassment, INDOT also took appropriate remedial measures. After Marshall reported issues to Applegate, Marshall claims that the "leering" continued. (Marshall Dep. 25:17-25.) Marshall reported this to Applegate, and the "leering" stopped on December 18, 2017. (Marshall Dep. 26-27:24-7, 117:8-23.)

Even though the touching and the leering stopped, Marshall was still unhappy with INDOT's actions. Marshall believes the investigation was not handled properly and that there should have been a final report issued. (Marshall Dep. 27:4-18, 79:12-23, 81:8-17.) However, INDOT stopped the alleged harassment, and that is all that matters under the Title VII analysis of remedial measures. "The focus of the inquiry at this point is whether the employer took appropriate steps to prevent the harassment from recurring, not whether the employer took the punitive actions that the plaintiff felt to be necessary." *Park v. Pulsarlube USA, Inc.*, 209 F. Supp.3d 1034, 1043 (N.D. Ill. 2016) (citing *Lapka v. Chertoff*, 517 F.3d 974, 984 (7th Cir. 2008)); *see also Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000) ("However, the question is not whether the punishment was proportionate to [the alleged harasser's] offense but whether [the employer] responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring.")

INDOT took appropriate remedial measures. Once Marshall informed Applegate of the alleged harassment, it stopped. Thus, INDOT is entitled to summary judgment on Marshall's sexual harassment claim.

Next, INDOT seeks summary judgment on Marshall's retaliation claim. Marshall claims that she was disciplined in retaliation for complaining of Dull's behavior. (Dkt. No. 1-2, ¶ 4.) To

24

survive summary judgment on a Title VII retaliation claim, an employee "must produce enough evidence for a reasonable jury to conclude that (1) she engaged in a statutorily protected activity; (2) the [defendant] took a materially adverse action against her; and (3) there existed a but-for causal connection between the two." *Burton v. Bd. of Regents of Univ. of Wis. Sys.*, 851 F.3d 690, 695 (7th Cir. 2017). In the Title VII retaliation context, causation can be established by circumstantial evidence, which includes, for example, "suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). This list is not exclusive; the plaintiff can point to any "other evidence from which an inference of discriminatory intent might be drawn." *Id.* at 1019.

INDOT argues that Marshall's complaints against Dull and her EEOC claim were not the but-for cause of Marshall's discipline. Instead, as explained above, Marshall's unprofessional interactions were the but-for cause of her discipline.

INDOT further argues that there is no evidence that INDOT retaliated against Marshall, nor is there any rational explanation for why Neuenschwander would so retaliate. Marshall talked to Applegate about Dull's alleged actions, and the situation was remedied. As INDOT notes, this case would appear to be a textbook example of how an organization should handle a complaint of sexual harassment.

INDOT also claims that the timing does not support a claim of retaliation. "Suspicious timing by itself will rarely support an inference of retaliation, but it may do so '[w]hen an adverse employment action follows on the close heels of protected expression and the plaintiff can show the person who decided to impose the adverse action knew of the protected conduct.'"

25

*Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016) (quoting *Culver v. Gorman & Co.*, 416 F.3d 540, 546 (7th Cir. 2005).

In the present case, as discussed above, Marshall reported the allegations to Applegate on November 13, 2017. (Marshall Dep. 23-24:22-6; Marshall Dep. 64-65:22-14.) But Marshall's written reprimand, her first disciplinary action, did not occur until February 8, 2018. (Neuenschwander Decl. ¶ 3; Def. Ex. C – Written Reprimand.) A two month gap between the protected activity is too great a temporal gap to permit a reasonable inference of causation based on timing alone. *See, e.g., Kidwell v. Eisenhauer*, 679 F.3d 957, 967 (7th Cir. 2012) (concluding that a five-week gap between the protected activity and the adverse employment action "militate[s] against allowing an inference of causation based on suspicious timing"). "For an employer's actions to be on the close heels of an employee's conduct, thus allowing an inference of causation based on timing alone, [the Seventh Circuit] 'typically allow[s] no more than a few days to elapse.'" *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019) (quoting *Kidwell,* 679 F.3d at 966) (the protected activity and adverse action must be "very close" in time); *see also Lord*, 839 F.3d at 564 (plaintiff was fired two days after he complained about sexual harassment). After Marshall's 5-day suspension, Marshall filed her EEOC claim on April 17, 2018. (Def. Ex. H – EEOC Complaint.) But Marshall was not terminated until more than three months later on July 24, 2018. (Def. Ex. E – Termination Letter.) As noted above, if a two month gap is too great a temporal gap to permit a reasonable inference of causation based on timing alone, *Kidwell*, 679 F.3d at 967, then a gap of greater than three months similarly does not permit a reasonable inference of causation.

INDOT also maintains that since the temporal proximity does not support Marshall's

retaliation claim, Marshall can survive summary judgment only "if there is other evidence that supports the inference of a causal link." *Daza*, 941 F.3d at 309 (quoting *Culver*, 416 F.3d at 546). The other evidence on which Marshall relies is the argument that she never had any issues at work until after she reported the Dull allegations. Thus, according to Marshall, the disciplinary actions are pretextual. "[A]n employer's sudden dissatisfaction with an employee's performance after that employee engaged in a protected activity may constitute circumstantial evidence of causation." *Culver*, 416 F.3d at 546 (quotation marks and citation omitted).

However, INDOT claims, Marshall has not provided any evidence from which a reasonable jury could find that Neuenschwander was suddenly dissatisfied with Marshall's performance after her protected activity. Rather, there were four different incidents to which Marshall has testified – the interactions with Murawski, Newsome, Hunter, and Applegate. Again, it is undisputed the incidents occurred, Marshall just disputes that she was unprofessional during the incidents. In each instance, Neuenschwander did an investigation and spoke to everyone involved. (Ex. B – Neuenschwander Decl. ¶¶ 3-7, 9-13.)1 Even if he reached the incorrect conclusion, erroneous decisionmaking by an employer is not sufficient to establish pretext. *Pitasi*, 184 F.3d at 718. "Therefore it is not sufficient for the employee to show that [her] employer fired [her] for incorrect or poorly considered reasons. [She] must establish that the employer did not honestly believe the reasons it gave for terminating him." *Id.* Further, even if Marshall had not acted unprofessional during her multiple interactions, she has presented no evidence that Neuenschwander knew that Murawski, Newsome, Hunter, and Applegate were lying.

Lastly, INDOT argues that to the extent that Marshall claims that INDOT retaliated

27

against her because they did not allow her to apply for the AA6 position in the Logistics Department, that claim is just a red herring. A "new" AA6 position was never created. Neuenschwander simply moved Erin Hunter, an AA6, to the Logistics Department. (Ex. B –Neuenschwander Decl. ¶ 8.) Neuenschwander chose to move Hunter because Hunter was the best damage-wise coordinator at INDOT and she frequently worked and trained others that work with damage-wise. (Ex. B –Neuenschwander Decl. ¶ 8.) INDOT argues that, to the extent Marshall is arguing that she was unable to apply for the job as retaliation for her complaints about Dull, that is simply incorrect. No one was able to apply for the job. Hunter was simply moved from one department to the other.

INDOT further points out that the Logistics Department AA6 position was never posted or open for anyone to apply. (Ex. B –Neuenschwander Decl. ¶ 8.) Marshall admits that at a manager meeting Neuenschwander told everyone that there would not be an AA6 in the Logistics Department. (Marshall Dep. 49:17-21.) So, to the extent that Marshall is claiming she was lied to about the position, then Neuenschwander, Applegate, and Vanderbilt lied to everyone at INDOT about the position. That is not evidence that they were retaliating against Marshall individually.

In response to INDOT's request for summary judgment on her retaliation claim, Marshall claims that the timing of and circumstances of Marshall's termination are suspicious. (ECF 30 p. 8.) However, as noted, Marshall reported her allegations on November 13, 2017, and was not terminated until July 24, 2018, more than eight months after her allegation. As discussed above, the timing simply does not support a claim of retaliation. (ECF 20, pp. 22-23.) If a two month gap is too great a temporal gap to permit a reasonable inference of causation based on timing alone, *Kidwell*, 679 F.3d at 967, then a gap of greater than eight months similarly does not permit

a reasonable inference of causation.

Marshall argues that INDOT's failure to follow its own policy and produce a written investigative report is further evidence of retaliation. However, INDOT correctly point out that there is no legal requirement under Title VII that a written investigation be produced. In any event, even if INDOT did fail to follow their own policy, the alleged harassment stopped. Any additional investigation was not necessary to stop the alleged harassment. It appears that Marshall believes that Dull had to be punished or else Title VII was violated. But "[t]he focus of the inquiry at this point is whether the employer took appropriate steps to prevent the harassment from recurring, not whether the employer took the punitive actions that the plaintiff felt to be necessary." *Park*, 209 F. Supp.3d at 1043 (citing *Lapka*, 517 F.3d at 984); *see also Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000) ("However, the question is not whether the punishment was proportionate to [the alleged harasser's] offense but whether [the employer] responded with appropriate remedial action reasonably likely under the circumstances to prevent the conduct from recurring.")

Clearly, Marshall was informed that an investigation had been completed. (Marshall Dep. 81:8-17.) Marshall has not explained why she believes that the failure to produce a written report is evidence of harassment, retaliation, or any other legal claim. It simply has no basis in law, and does not support her Title VII claims.

Marshall seems to suggest that her unprofessional behavior was justified. She claims that she was reprimanded for doing her job regarding the key log incident. (ECF 30, p. 8.) The undisputed evidence clearly shows, however, that Neuenschwander investigated this incident and determined that Marshall had been unprofessional. Whether Marshall believes that she was doing

29

her job when she was unprofessional is irrelevant.

Marshall next claims that she was only confronting Applegate about being less than truthful about the AA6 position. (ECF 30, p. However, even if Applegate was being untruthful, Marshall isn't somehow justified in being unprofessional. The undisputed evidence shows that Applegate told Neuenschwander that Marshall had called Applegate a liar and had been unprofessional. When assessing a plaintiff's claim than an employer's explanation is pretextual, courts "ask only whether the employer's explanation was "'honestly believed.'" *Argyropoulos*, 539 F.3d at 736. There is no evidence that Neuenschwander did not honestly believe Applegate. Thus, Marshall cannot establish a pretextual reason for her termination, and INDOT is entitled to summary judgment on Marshall's retaliation claim.

To the extent that Marshall is claiming that the failure to get this "new" AA6 position is evidence of retaliation, Marshall was already an AA6. (Marshall Dep. 10:3-9.) A lateral transfer is not an adverse employment action. *Stutler v. Illinois Dept. of Corrections*, 263 F.3d 698, 702-03 (7th. Cir. 2001). It follows that the denial of a lateral transfer is also not an adverse employment action.[1]

Accordingly, as there is no evidence of retaliation, summary judgment will be granted to INDOT on Marshall's retaliation claim.

---

[1] INDOT also notes that Marshall's claims that she wanted the "new" AA6 position and was lied to about it do not add up. Marshall claims that she wanted to get the "new" AA6 position because it would allow her to leave the situation with Tom Dull. (Marshall Dep. p. 49.) But even by Marshall's own testimony, that AA6 position became Tom Dull's administrative assistant. *Id*. Marshall is claiming that she was retaliated against because she did not get a position as Tom Dull's administrative assistant when she specifically testified that she wanted to get away from Tom Dull. Arguably, if Marshall had gotten the position, she would then have claimed she was retaliated against because she was given the position.

<u>Conclusion</u>

Based on the foregoing, INDOT's motion for summary judgment [DE 19] is hereby GRANTED in its entirety.


Entered: June 8, 2020.


<div style="margin-left: 50%;">

s/ William C.  Lee
William C. Lee, Judge
United States District Court

</div>